JOURNAL ENTRY AND OPINION
Appellant Betty Carter appeals the juvenile court's granting permanent custody of her two daughters to Cuyahoga County.
Betty Carter voluntarily placed her daughters in county custody in 1994, when Angela was nine and Alexandria was eight. The girls have been in county custody ever since, alternately in foster care and at the Children's Aid Society. Both girls have behavior problems and have been in therapy for the last four years.
The parties give conflicting reasons for the voluntary placement with the county, but agree that Betty Carter was having trouble controlling Angela's behavior, was in serious financial trouble and was without a home, and was embroiled in a troubled romantic relationship which negatively affected the children. Betty also has four adult children, all of whom were in county custody for portions of their childhoods and now have criminal records and/or are currently incarcerated. Betty herself was in foster care as a child and is the product of a dysfunctional alcoholic home.
Early in their county custody, the county prepared a case plan to reunite the girls with their mother. The case plan required temporary county custody of the girls, psychological assessments of the mother and the two girls, individual counseling for all three, family counseling, and parenting education. The girls first were placed in several foster homes, but because behavior problems prevented the placements from being successful, they were placed in the Children's Aid Society. They received ongoing counseling, and were permitted supervised visits with their mother at the Metzenbaum Center. Mother began seeking custody of the children several months after placing them with the county. At the time of the hearing, the girls were in separate, successful foster home placements; however, neither foster family was interested in adopting either of the girls.
Both the testimony of the social workers assigned to the family and the psychological report of the mother portray her as an angry, self-absorbed, and victim-like woman whose treatment of her children alternates between overindulgence and angry outbursts. Although Betty claimed that the county was preventing her from regaining custody of her daughters, she failed to comply with the case plan, which would have enabled her to regain custody. She refused to submit to psychological evaluation for three years, did not cooperate in individual counseling, and frequently missed the family counseling sessions. When she finally attended the required parenting classes, she was so disruptive that she had to be removed from the group classes and tutored individually. Even then, although she attended the sessions, she did not complete the course satisfactorily, and the teacher suggested further parenting classes for her and recommended against reuniting her with her daughters.
The reports of the guardian ad litem and one of the social workers state that Angela wants only limited contact with her mother and definitely does not wish to live with her. The same reports on Alexandria show that she vacillates between fantasizing an ideal life with her mother and never wanting to see her again. Both girls are reported to have increased behavior problems after visits with their mother.
At the time of the hearing, mother was unemployed, living in a hotel, and awaiting worker's compensation and unemployment payments, although neither had been awarded yet and, in fact, her case had not gone to hearing yet.
The county first took custody of the children in August of 1994 and put them into long-term foster care two years later. Temporary custody was renewed in 1998. In April of 1999, the county was awarded permanent custody. From this award of permanent custody, mother timely appealed.
Appellant's first assignment of error states:
 THE COURT ERRED IN TERMINATING MS. CARTER'S PARENTAL RIGHTS BECAUSE OF HER `SEVERE AND CHRONIC MENTAL ILLNESS' WHEN NO EVIDENCE OF HER MENTAL ILLNESS WAS INTRODUCED.
Appellant's first assignment of error is overruled. Appellant is correct in stating that the record lacks sufficient evidence concerning her mental health to support the verdict; however, because the record contains sufficient evidence to support the termination of parental rights under other provisions of the statute, the lack of evidence regarding her mental health constitutes harmless error.
The juvenile court's determination that it was in the children's best interest to award permanent custody to the county was valid under R.C.2151.414(E). That statute states in part:
 In determining at a hearing * * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with his parents, the court shall consider all the relevant evidence. If the court determines, by clear and convincing evidence,* * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either of his parents within a reasonable time or should not be placed with his parents:
 (1) Following the placement of the child outside his home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly for a period of six months or more to substantially remedy the conditions causing the child to be placed outside his home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties. [Emphasis added.]
The court may award permanent custody to the county if one or more of the conditions enumerated in R.C. 2151.414(E) exists. Although the court did not state it in its judgment entry, adequate evidence exists in the record to support a finding that Betty Carter failed continuously and repeatedly for a period of six months or more to substantially remedy the conditions causing the child to be placed outside his home. For three years after the children were placed in county custody, she failed to participate in the psychological assessment required by the case plan. When the psychological assessment finally occurred, she failed to cooperate with the psychologist.
Although the psychologist did not diagnose Betty as mentally ill, he did advise that without significant change on her part, she should not be reunited with her children. His report states:
 Attempts at further reunification would jeopardize the progress [the children] have made in their current therapy. Any efforts at future reunification would have to be contingent on Ms. Carter demonstrating through active involvement in treatment a change in her capacity for recognizing her own issues and the needs of her children. Ms. Carter will only function better when she is able to transcend her ongoing sense of victimization and her reenactment of such victimization in her relationships with others. Given her resistance to even an evaluation it is likely that Ms. Carter will reject any strong notion of her own treatment needs. Such refusal would be a strong indication of her unwillingness to deal with the serious issues that have compromised her parenting and if this occurs then movement towards more permanent placement [of the children] would be indicated.
(Psychologist's report at 7.)
Each of the other professionals who wrote reports and/or gave testimony at the hearing agreed that it was in the children's best interests for them to be placed in permanent county custody. Each professional also testified that Betty failed to cooperate with the case plan, even though all the assistance was available with no charge to her. Although she belatedly completed the parenting classes, she failed to learn the necessary parenting skills required. She attended only half of the family counseling sessions scheduled with Alexandria, and failed to see her own personal need for counseling. Rather, the testimony shows that Betty continually blamed others for her difficulties and was not able to see her own role in the family's problems. The fact that Betty's noncompliance fulfills the requirements of R.C. 2151.414(E)(1) is enough to justify the court's placement of the children in permanent custody.
Appellant is correct, however, that the record fails to establish by clear and convincing evidence that she suffers from a severe and chronic mental illness. The court's final judgment entry states
 The court further finds that the children cannot be placed with their parents for the following reasons: mother suffers from a severe and chronic mental illness which prevents her from providing adequate care of children.
R.C. 2151 incorporates the definition of mental illness stated in R.C.5122.01(A): `Mental illness' means a substantial disorder of thought, mood, perception, orientation, or memory that grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life. None of the testimony or reports diagnoses Betty with a mental illness.
The MMPI (Minnesota Multiphasic Personality Inventory) is a psychological test used to diagnose mental illnesses. The psychologist did not diagnose Betty with a mental illness based upon her MMPI results.[1] Rather, his report states that she is defensive, guarded, and mistrusting of the system. Although all the professionals describe Betty as difficult and angry, none of them states that she is mentally ill.
Because the county proved, by clear and convincing evidence, that Betty failed to fulfill the requirements of 2151.414(E)(1), the failure to prove mental illness under 2151.414(E)(2) is harmless error. The court found by clear and convincing evidence that grounds existed to place the children in permanent county custody.
As Judge Rocco stated in his concurrence in In matter of Leverett (Mar. 26, 1998) Cuyahoga App. Nos. 71357, 71358, 71359, 71360, unreported, 1998 Ohio App. LEXIS 1167,
 An appellate court may decide an issue on grounds different from those determined by a trial court provided that the evidentiary basis for the appellate court's determination was made part of the record below. State v. Peagler (1996), 76 Ohio St.3d 496, 668 N.E.2d 489
(syllabus). Appellee's motion for permanent custody was filed pursuant to R.C. 2151.414(E)(1)-(8). Although the juvenile court's disposition of the motion was based on R.C. 2151.414(E)(2) (chronic mental illness), the Ohio Revised Code states that a custody finding can be based on any one or more of the following factors listed in (1)-(8).
 The statute mandates that the juvenile court determine what is in the best interest of the child.
 R.C. 2151.414(B). Recalling that the legislative intent behind R.C. 2151.414 was to provide * * * that each child receives proper parental care or guardianship and that it was designed to provide for social intervention into the biological family when the child's needs and welfare demand it, the juvenile court could have found sufficient evidence to grant permanent custody to appellee. In re Lay (1987), 43 Ohio App.3d 79, 539 N.E.2d 664.
Id. at 7. The affidavit filed in support of the county's motion for permanent custody in Leverett stated that `Mother has not sufficiently comprehended parenting skills to warrant reunification with her children' and that the `Mother has not addressed the initial concerns and conditions which brought about the children's removal from the home.' Id. at 7. Similar evidence in the case at bar supports the trial court's finding in favor of the county.
Appellant's second assignment of error states:
 THE TRIAL COURT VIOLATED MS. CARTER'S CONSTITUTIONAL DUE PROCESS RIGHTS BY RELYING ON INADMISSIBLE HEARSAY REGARDING HER DAUGHTERS' WISHES TO END VISITATION.
Appellant claims that [t]he children's purported wish to end visitation was the key issue in this case, as it was the only reason for changing the status quo of `long term foster care' with visits at the children's election. Appellant's reply brief at 6. This inaccurately characterizes the county's case. As the county stated in its opening, Mother has failed to complete certain aspects of her case plan. The parts she has completed, she's failed to benefit from and demonstrate adequate parenting techniques. There are also issues with the children not wanting to visit the mother that also play into that. Tr. at 5.
There is ample evidence without the allegedly objectionable hearsay testimony to support the conclusion that the children were at least ambivalent about seeing their mother. Additionally, appellant did not object at the hearing to much of the hearsay she objects to in her brief. Any objection not preserved at trial cannot be addressed by the appellate court. Evid.R. 103(A)(1). Thus this court is restricted to addressing the few instances in which appellant did object.
Appellant objected when social worker Lympany stated that Alexandria did not request visitations to be ended, but she did write a letter saying that she, you know, wanted to go into permanent custody. Tr. at 29-30. The letter itself was not introduced into evidence, but the trial court allowed this limited paraphrase of the girl's statement into evidence. Appellant next objected to the use of the term verbal abuse to describe Betty's language during the incident at Metzenbaum Center in which security had to intervene. Tr. at 95. Additionally, appellant objected to testimony in which social worker Marsha Reed stated, [Alexandria] did, on that day, say that she didn't want to see her mother again * * *. Tr. at 97. The court sustained that objection. Another objection was raised by appellant to social worker Reed's testimony regarding whether Betty and Alexandria had bonded. Because this last objection does not address any hearsay statements from Alexandria but rather relies on the impressions of the witness, it is inapplicable to the hearsay issue.
The issue of hearsay regarding the wishes of the child is significant because the child's wishes are one factor the court must consider when deciding a permanent custody case. However, although the child's wishes are one of the factors considered by the court when making permanent custody decisions, other factors are also considered. R.C. 2151.414(D) lists these factors:
 In determining the best interest of a child at a hearing held pursuant to division (A) of this section * * * the court shall consider all relevant factors, including, but not limited to, the following:
 (1) The reasonable probability of the child being adopted, whether an adoptive placement would positively benefit the child, and whether a grant of permanent custody would facilitate adoption;
 (2) The interaction and interrelationship of the child with his parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child;
 (3) The wishes of the child, as expressed directly by the child or through his guardian ad litem, with due regard to the maturity of the child;
(4) The custodial history of the child;
 (5) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency.
The child's wishes are one of five enumerated considerations which the trial court must make. The statute does not say that the court is bound by the child's wishes or that the court cannot override the child's wishes if it is in the best interest of the child.
The evidence demonstrated ambiguous feelings on the part of the girls towards visitation with their mother. Betty's psychological evaluation, which was admitted into evidence (Tr. 1 at 16), includes interviews with both girls in which they indicate their desire to return home. In his psychological evaluation, which contained an interview with Angela, the psychologist, Dr. Randall Baenen, Ph.D. noted
 [that] she wants to go home[,] that she is worried about her brother who has a history of incarceration and that she wants to cause no additional trouble in her own family. * * * When asked about her wishes she stated that it would be to go home, to be comfortable but not wealthy and to see her brothers stay out of trouble.
Psychological Evaluation at 4-5.
 In Alex's interview he states She wants to go home with her mother. * * * When asked about her wishes he [sic] stated that it would be to go home, live in a big mansion and drive a purple convertible.
Id. at 5.
In the psychological evaluation, Dr. Baenen notes that case worker Ms. Haraway stated that in her earlier discussion with the psychologist there are serious concerns about [the] mothers [sic] stability and her ongoing resistence to Department of Human Services case plan directives. (Psychological Evaluation at 5-6.) She noted that Ms. Carter clearly has some bond with the children but that she alternates between indulging them and getting angry at them for their misbehavior. Id. Finally, she notes that according to the Department of Human Services records Ms. Carter's anger and resistence and lack of openness are longstanding characteristics. She relates in a way that reinforces her sense of victimization and exploitation. Id.
Appellant objects to hearsay evidence given by social worker John Lympany; for example, she objects to his reference to the contents of a letter Alexandria allegedly wrote which was not introduced into evidence. However there is enough direct evidence in Lympany's testimony to support the conclusion that the girls were ambivalent about visiting with their mother. Lympany described visits he witnessed in which Betty spent more time telephoning his supervisors to complain about him than she did visiting with her daughter. Tr. at 12. Social Worker Lympany also described an incident at the Metzenbaum Center in which Betty became so vociferous that security had to be called, and Betty ran out of the center and refused to finish the visit with her daughter. Finally, Lympany stated that in his professional opinion, Betty had not cooperated with agency efforts to reunify her with the girls in a timely fashion. Tr. at 31.
Children's therapist Karen Maidment testified without objection that
 [Alexandria] wants to believe [she can be reunited with her mother] very much, and so and her mother has been very sincere in saying, I want you to come home. So Alex would get very attached to that and start to believe that that's possible for her and that she wants that. At other times, when she is angry with her mother, she has said to me, I don't want to see her. * * * Her worst behavior was after contact with her mother. * * * I think that I would support the county's request for custody.
She also testified that Alex's worst behavior was always around issues with her mother. * * * [H]er acting out behavior always occurred after issues [addressed in therapy] with her mother. * * * She would be very disappointed when her mother would miss visits, which ___, Mother's visits were very sporadic. Tr. at 53.
Social worker Marsha Reed also testified that Alexandria's behavior was significantly different after a visit with her mother. She stated that On the ride home, she's — she vacillates — she's either very, very hyper or very depressed and quiet, and she always asks if we could stop to eat. And at that point, she eats a lot. I've never quite seen a child eat that much, but she does eat a lot. Tr. at 100.
Social worker Maidment also testified that * * * Mother, when she would get upset with Alex, she wouldn't appear for the next appointment, and that would be upsetting to Alex. Tr. at 62. Finally, on cross examination, when asked if the children wanted to go home, she responded, Alex would say both. She would say yes, she did and then, she would say no, she didn't. Tr. at 68.
Many examples of testimony that the girls did not want to visit with their mother were admitted without objection. Social worker Lympany stated without objection that Angela requested visitations be stopped. Tr. at 25. He also testified without objection regarding Alexandria's desire to see or not see her mother, it's like fifty-fifty. Tr. at 28. Similar testimony from social worker Maidment stated, the major way to describe Alex's relationship with her mother is ambivalent. She has times when she wants to be very close to her mother. She has other times when she doesn't want to be with her mother. No objection was raised to this testimony, or to the subsequent testimony from Maidment that at times Alexandria would say, I don't want to talk to her, I don't want to see her. Tr. at 52. Maidment also testified that Betty missed over half of her family counseling sessions with Alexandria [Tr. at 53] and that she had missed both Alexandria's birthday and Christmas. Tr. at 54. All the testimony from the social workers indicated that Mother had great difficulty * * * focusing on Alex's issues. Mother had her own issues. When she became upset, she shared those issues in front of Alex. Alex told Maidment, I try to speak when my mother's there, I can't break in * * *. Tr. at 55. Again, no one objected to this testimony.
The statute requires the court to consider [t]he wishes of the child, as expressed directly by the child or through his guardian ad litem * * *. The court did not take testimony from either of the girls, although they are both adolescents, and the guardian ad litem did not offer any testimony on this issue. However, that does not mean that the court must disregard evidence on the wishes of the child when that evidence comes from another source.
Appellant alleges in her brief that [t]his damaging material tainted the outcome of the trial. It was used to persuade the court that Alex and Angela had no bond with their mother. Otherwise, permanent custody was unnecessary, inappropriate, and harmful. Appellant's brief at 8. Appellant concludes that the only argument for a change in custody was that Alex and Angela had nothing to lose, i.e., no positive bond with their mother or family. Appellant's brief at 9. There is more than adequate evidence to provide clear and convincing proof that, although there is a bond between Betty and her daughters, this bond is not beneficial to the girls and visits with Betty are not in the girls' best interest.
The transcript and exhibits in this case provide by clear and convincing evidence more than sufficient grounds to support the award of the children to the permanent custody of the county. The evidence showed that the girls were conflicted in their feelings towards their mother because of her inconsistent and erratic behavior. The girls' behavior was significantly worse following contact with their mother, and her uncontrolled and unreliable behavior is adequately documented.
Even if all of the alleged hearsay evidence is eliminated, there is clear and convincing evidence that Betty's visits with the girls were not in their best interests and that the court was justified in awarding permanent custody to the county.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Juvenile Court Division of the Cuyahoga County Common Pleas Court to carry this judgment into execution.
JOHN T. PATTON, J., and PATRICIA ANN BLACKMON, J., CONCUR.
 __________________________________ DIANE KARPINSKI, PRESIDING JUDGE
[1] The psychologist's report states, Ms. Carter produced a defensive MMPI-2 protocol as evidence [sic] by her high L-raw score of 7 which indicates that she has some reluctance to reveal typical flaws or personality issues. This is a typical test taking attitude for individuals undergoing court evaluation and scrutiny. Id. at 4.